Mr. Yasper. Thank you, Your Honor. This is a bid protest case. It's not moved because no in-water work will be done before June 15, 2010. There's still time for this Court to take affirmative action. I think you told us that in a post-briefing filing that we rejected, right? That's correct, Your Honor. I wouldn't be repeating the point if I were Well, why don't you begin with your argument on the merits. Yes, Your Honor. One of the by discussing price with Kiewit prior to the time that the technical proposals were determined. I think it's important for the Court to know, and you can look at A172 to 174, which is the affidavit that the Court let in. I think it's important for the Court to know that all of the price proposals were opened at about the time that Kiewit's price proposal was opened. So we don't know what the SSB had and what they didn't have, but we know that they were all open. The only thing that the Court really found Kerr wanting on was placement plan. If you look at 112 to 115 and 124, you can see, first of all, that their mining plan was acceptable, and if you look at 112 to 115 and the chart that follows 124, their plan for transporting the rock was, by the time the second proposal came in, acceptable. So, Yes, Your Honor, and correct me if I'm wrong, my understanding was that this particular job was sort of unusual because they were repairing this particular jetty that had a bullnose stack that sticks out and it's big, big rocks down very deep, right? Right, and it's a placement, it's Kerr's placement plan that the Court found to be not acceptable. But it's a specialized work, working on a bullnose jetty. How much experience did your client have in doing that? My client has experience working on two other jetties. I'm talking about this particular type of jetty. I thought there had been a finding that hadn't done his bullnose work. He has not done bullnose work before, Your Honor, and they found that to be a deficiency. But if you look at the other two, the other two, There were three deficiencies. There were three, well, Reach on the excavators, a lack of experience on the bullnose jetty, and a tied window on weather assessment. Right, but if you look at the other two, they found his lack of jetty, his lack of bullnose experience to be a deficiency. But for Tappany and for the other proposal that they found unacceptable, they only found the lack of jetty head experience to be a weakness. The government's argument is that's harmless because it doesn't go to the question of comparing you against the person who won the contract. The government's response to that point was that that doesn't matter. It's harmless even if it wasn't there because the proper comparator is your experience against, your lack of experience is measured against the fact that the person who won the contract had experience in this field. Well, I understand that, Your Honor, but they had to find, because my client was the lowest priced proposer, they had to find something, they had to find a clear deficiency to Can I ask you this question and maybe you can help me out? If there are three grounds on which your client's position was rejected, three deficiencies, do you have to, and those three deficiencies are affirmed by the court on the basis of what the contracting officer did to you, do you have to overcome all three to prevail? I don't think I have to overcome all three to prevail, Your Honor. I think those deficiencies that they found were deficiencies that they said Can they award a contract if they find a deficiency? Can legally a contract be awarded to a contractor? Not if it's a deficiency, but if it's a weakness, they can. Okay, so my point is if they find one deficiency, then in order for you to prevail, you'd have to knock down the one deficiency. If they find three deficiencies, it would seem to me that you have to prove the incorrectness of all three deficiencies. Well, but Your Honor, the deficiencies they found were deficiencies that in order to find these deficiencies, they had to go outside of the contract. They had to go, they claimed instead of the 15-foot elevation, they created a 20-foot elevation. Instead of, with regard to the free board, with regard to the elevation of the tithes, they said that they, when evaluating our claim, free board is a safety factor. Minus three is a minimum must have. And that's nowhere in the contract. And they ignored our retreat language, Your Honor, which was that we would move off of the jetty with our retreat, with our excavators when it got dangerous. And we said that at A-158, A-159, 160, 162, 163. We said that we were going to retreat, and they just ignored it, Your Honor. The specific language in the proposal was these machines will retreat from this elevation, 10 feet, and continue work on the jetty from a higher elevation in work areas away from the tow bar. So we had a plan, and they just ignored it. How about the reach on the excavation? I beg your pardon? How about the reach on the excavation? Well, Your Honor, in order to find that the reach in the excavators was insufficient, they had to find that they had to go to minus 20. And every place in the specifications, maximum depth of construction is estimated at elevation minus 15 MLLW. The depth may vary from 0 feet to minus 15 feet. The elevation of the existing relic-based stone may vary from 0 feet to minus 15 feet. Maximum depth of construction is estimated at elevation minus 15 feet. If they had evaluated our excavators at minus 15 feet instead of minus 20 feet, they wouldn't have found them to be wanting. They didn't like the fact that we were working at 10 with the excavators, but they ignored our retreat language, and they told Tapani when they interviewed them, we don't want anybody working below 22. They didn't tell us that. It's not in the specifications. They evaluated us on terms that are not in the specifications. That's how they found our placement plan wanting and deficient. And it was only our placement plan that they found deficient. They didn't find our mining plan deficient. They didn't find our transportation plan deficient. It was only our placement plan deficient. What's the 15 feet? Is that the 15 feet, which was minus 15 feet, is the original site of the jetty? Well, it's called 15 feet. I'm trying to get my handle on the minus 15. From my understanding, looking at the drawings, it looked like that's 15 feet underwater is where they thought the bottom of the jetty was. It's minus 15 feet mean low, low water, Your Honor. Right. Now, the court said that, heard your argument about the fact that the maximum depth was going to be minus 15 feet, and they said that the drawings in the solicitation warned that the location of the jetty stone will vary depending on the site conditions and time of construction. If you look at the drawings... Right, right, but I mean, they note that the fact that the location of this existing stone will vary. And I thought there was a finding that the tricky part here is that some of the stones had become dislodged from where they originally were placed, even though they weigh several tons and may have drifted out into deeper water. So the possibility was there that we'll call it the sort of the linchpin, the bottom, bottom stone on the nose of the bullnose has floated out into what will be deeper water. Well, those would be called the relic stones, Your Honor. Right. Didn't the contractor require you to fish up the relic stones? Yeah, the contractor did have to fish up the relic stone, but the contractor did it anyway. He was going to use the same excavators to fish up the relic stones? He had the choice of using the excavators or his approved crane to do this, Your Honor. He had the choice. The excavators were mainly there, and all his language says is the excavators were mainly there to move the stones into place as they were being let down by the crane. In other words, to nudge, and that's what they said in their writing. Was this to replace the entire journey, fish up all the old stones, or was it to use some of the old stones in replacement, you know, reconfigure where they were? Well, the relic stones were going to be picked up and moved back towards the bull. They were going to be left in place and moved slightly. Was there a reason that some of the existing stone could be used in rebuilding the jetty? Well, as a base for the W1 and the W2 stone, Your Honor, the W1 and the W2 stones were the really big stones that they were going to replace out, that they were going to put out at the end of the jetty. But the relic stones would remain in the jetty? The relic stones would, yes, Your Honor. Why don't we hear from the government now? We'll give you some more time on your part. Yes, Your Honor. Thank you, Your Honor. Okay, please, the court. Now, you represent, oh, you, you. Actually, no, Your Honor. My name is Patrick Drescher. I represent the United States in this case. Okay, so you're going to split with, you're going to split with Mr. Patrick. May it please the court, the last line of questioning from the court was with respect to the depth of the work that had to be done, so I'd like to turn first to that issue. In the solicitation, in the language that occurs, quoting to in its brief, that language talking about an estimated depth ranging up to 815 feet, that is from a section in the solicitation that's called Summary of Work. That's on page A52 in the Joint Appendix. And the Summary of Work specifically states that it does not provide the technical detail. It states it's to be used in conjunction with other sections and the drawings to establish the total work requirements, so. Where in the contract is there a showing of greater depth than minus 15 feet? It's in the drawings, Your Honor, and it's specifically on A191. And it's really the relevant drawing on A191, which is the second drawing in the back of the appendix. What's the drawing? The relevant drawing… You've got four of them there. Yes, Your Honor, that's correct. They show different sections of the jetty. That's the central point number one. If Your Honor were to look at, for example, the upper left-hand drawing, it says Section AC2. What that says is begin transition section. The next drawing is transition, begin full jetty head section. The next drawing says midway through transition section. Finally, Section DC2, that's the bullnose. This is a long jetty. It has different sections, and the bullnose is what's at issue in this case. And it's the bullnose, the tip of the jetty, that is exposed to the greatest ocean forces, tides, and current. And this is where… Which piece on DC2, which piece is sticking out in the ocean further? The furthest piece is DC2, Your Honor. But does that show a piece on it? Where is the bullnose? Oh, Your Honor, if Your Honor were to flip back to the previous page, that's page 8190, this shows an aerial view of the jetty. And the jetty at issue is the top one in the picture, the so-called north jetty. Right, and it's the furthest piece sticking out, right? That's the bullnose. The bullnose has, just for the Court's reference… What does DC2 show us about the depth of the water at that point? It shows that the depth of the tow keystone on the left-hand side of the drawing… Minus 20. That's right. And that's exactly why Kerr's excavators lacked the required reach. They were not able to reach that depth. Now, how… Were they supposed to get their own tide analysis at that point, or did you provide them the tide analysis? Kerr submitted to the Court of Engineers a chart that it called… It's calculated numbers, and the court below focused on that chart, and that chart is found on pages A100 through 104. That tide cycles chart that Kerr submitted demonstrates, and that's what the Court based its decision upon, among other things, demonstrates that Kerr intended to work, use the excavators at the 10-foot portion of the jetty. For the Court's illustration, the jetty has two flat spots. One is the top of the jetty, so-called the crest. That's the 22-foot mark, and these numbers are relative to the water level. So the 22-foot mark is essentially 22 feet above the water, and that's where the crane was supposed to work from. Now, the second mark, the second elevation is the 10-foot elevation. That's what's called a tow berm bench. It's an area that's flat that's around the front of the jetty, and that's where the excavators were to be positioned, according to Kerr. Now, these excavators are now much closer to the water, and based on this handwritten chart that Kerr provided, the Corps looked at it and has determined that Kerr intends to work essentially every day with a water elevation ranging all the way up to possibly 6 feet. Six feet is very close to the 10-foot mark without any waves. Now, this jetty is far out into the ocean, and waves come from many directions, and because of the positioning of the relic stone below water, even if it's a calm day, waves can accelerate up and be quite significant, and that was a concern for the technical evaluation team, and it was a concern for the safety reason and independent reason why they found them unacceptable. And likewise, these excavators, not only were they going to work at tides that went too high too frequently, but also they didn't have the right reach. Now, Kerr did not provide any... And that would then allow them to have the requisite reach. Well, the problem with that argument, Your Honor, as the Court correctly found, is Kerr was required to put... If they were going to use the custom claw, they had to put it in writing. It existed at the time. That's Kerr's argument. Well, there's two problems with that argument. Number one, what they're citing to in their brief is the source selection plan, which was not in the solicitation. The solicitation, what that says is it says you have to specifically list all equipment. On page 849 in the solicitation, it states, indicate what equipment will be used. That's unambiguous. Now, yes, Kerr was also required to list equipment currently mounted, because for this type of construction project, it did matter to the Corps of Engineers whether or not all the equipment was currently owned or used by the contractor, or whether or not they had to obtain certain equipment. So if a contractor, for example, said we will use equipment A, B, and C, but we don't have any of it at this point in time, that could have been a factor. So these are two different issues. One, Kerr was unambiguously required to list all equipment. That's in the solicitation. Number two, after the discussions, they were given a written letter that stated to respond to all these issues in writing, and they failed to do so, and that's exactly why the court below excluded the affidavit of Mr. Kerr, because whether or not an oral discussion took place is immaterial to the court's effect. Well, it makes sense that the government wants to know what equipment are you going to use, whether you own it now or you intend to go buy it. Tell us what you're going to use, and if you've got something that's got something hung on it that's like, you know, not original equipment manufacturers, you've modified it. Tell me what you've done with your money. They were required to do both. They were required to indicate everything they were going to use, and of that everything, they were required to indicate which pieces did they currently own, and they failed to list the custom claw attachment in their proposal. If the court decided that the finding by the court in finding deficiency here on behalf of Kerr, that was sustained by the court below of lack of experience in this particular type of jetty work, would that alone be sufficient to affirm the result? If this court were to sustain one of the failures but not the others, the contract still could. The answer is, we believe that there are grounds to affirm all three, but they are required to demonstrate that, overcome each independent reason. I had the colloquy earlier, Mr. Yancek. So is it true that it would be unlawful for the court to issue a contract with someone that they had found deficient? That is correct. That contract cannot proceed. They have to be found acceptable on all grounds. It is not enough if you are found deficient on three independent areas to prove that you are. That is right. It seemed to me that Kerr's biggest problem was that they were found not to have any experience in dealing with this particular type of jetty. They have multiple problems, Your Honor, and that is one of them, absolutely. And on the issue of unequal ratings… If you had ever flown an airplane before, would they hire you to be a pilot? Probably not, Your Honor. And it is undisputed that Kerr did not have any experience working on the bullnose. And it is a very different kind of a job working on the bullnose versus working on the midsection of the jetty for a number of reasons, one of which is the exposure to waves on the bullnose is radically different than inside the channel. And the Corps of Engineers looked at that issue. Now, as to the argument Mr. Yazbek made about they were rated unequally, that is not true. The record does not support that whatsoever. If pages A71 and A72 show, and as the trial court found, Steelhead and Topani were also found deficient with respect to the lack of experience. The debriefing letter that Kerr is relying upon also says that they were, while lack of experience was a weakness, it was its combination with other weaknesses that created deficiency. That is entirely proper as well. So that argument also fails. Number one, there was no unequal rating. Number two, the combination of a weakness and another weakness can create a deficiency. Now, a few other points that Mr. Yazbek mentioned in his presentation that I wanted to address. He stated that the affidavit on pages A71, 72 through 174 was admitted by the court. That is not correct. The court did not allow supplementation with that affidavit. That would have been outside of the administrative record. That is correct, and that is exactly why the court did not. Pursuant to axiom, the court did not allow that information. So that is not part of the administrative record. And as Your Honor started the discussion with Mr. Yazbek, the issue about price, even if the court did find that the sharing of the price was a de minimis error, it had absolutely no impact on Kerr's proposal because it did not affect Kerr's chances of getting the award. So if there are any additional questions from the court, I would be certainly happy to answer them. But if not, I will turn it over to Michael Kemp. Okay. Thank you. Thank you. Douglas Patton for Intervenor, Kiewit Pacific. This record is a complex record involving highly technical issues on equipment, adverse weather conditions, and safety issues. And what Judge Bush's decision did and what DOJ's brief did is show you that for the subjective technical judgments that were made by the Corps of Engineers, there was a factual basis in the record to make those judgments. In effect, what this appeal is asking this court to do... The standard of review is very friendly to your position, isn't it? Yes, especially when you're dealing with highly technical subjective judgments. And in effect, what this appeal would require this court to do, respectfully, is become technical experts, review the record in detail, and substitute its subjective technical opinion for that of the Corps. And when you have... That's not exactly true. I mean, we have as much expertise as Judge Bush. We see these cases, so... That's correct. That's right. But what Judge Bush did, and it's the same position you're in, is effectively say, I've seen the record where the Corps had a factual basis to make that decision. That's what the standard of review is, both for Judge Bush and for us. That's right. But in effect, what the appellant is saying is we don't agree with that conclusion. We have a different conclusion. Look, if it were true that the maximum depth at which anybody had to work was 15 feet, right? Right. But nonetheless, Judge Bush said 20. She'd be wrong, right? That's correct. And we're just as capable of knowing whether it's 15 feet or 20, and she isn't. Right, but... So your adversary's argument is that she'd hoofed up and it shouldn't have been, you know, should 15 feet be the maximum depth. Now, he's going to lose on that point, but he's entitled to make that conclusion. My point is he's saying, well, you shouldn't just... That drawing isn't enough, that the summary standards, that the other language in the contract somehow overruled that drawing. And what Judge Bush found, it was rational for the court to read the entire record. If you look at 823 concerning the use of the excavators, Judge Bush rationally said we could read parts of the record selectively to find that Kerr may have clearly explained what the excavator's role was. But then she went on to quote that their proposal said that excavators will perform the re-handling or excavation of relics jetty stone. The large excavator will be used to handle relic jetty stone. And she said, given that record, the court rationally made a subjective judgment. And all I'm suggesting to you is that Judge Bush and DOJ have given you a very careful review of the record where there are factual bases to reach those conclusions. And whether or not they agree with those rational conclusions is not the standard of review. Thank you. Thank you. Are you guys back? Bullnose experience was another item that they didn't list in the solicitation as being necessary to get this project. And it was another unstated item in this solicitation that the Corps used to disqualify a contractor who could do this work. They don't say anywhere that you have to have bullnose experience and that it's going to be a deficiency not to have it. They ask you for your jetty experience. With regard to what Kerr said and in connection with the... Didn't they ask about just your qualifications?  Wouldn't part of your qualifications include whether or not you had experience? Well, they would. And they gave them their experience. But if the Corps was going to disqualify everybody that didn't have jetty head experience, why didn't they just say, well, we're going to give this contract to Kiewit and the rest of you don't need to spend the $80,000 or $90,000 that it takes to do this proposal. They didn't say that. They said, give us your experience. And they didn't say jetty head experience was necessary. And with regard to working during tide levels, here's what Kerr said in the quotes at page 8 of our reply brief. During the proposed months of July, August, and September, low tides range from 0.5 to 3 above mean low, low water. When tides rise or weather conditions present unsafe conditions, these machines will retreat. So the Corps asked them a general question about are you going to work below, are you going to work below, are you going to work when it's higher than 3? And they say, thinking they're talking about all of the time that they can be doing other things on the jetty, they say there's plenty of time, not necessarily for every item of work, but there's plenty of time to do all of the work on the jetty. And they give them what's at A103 to A104, and it shows the levels, the tide levels for the days, and it says what the work hours would be. But they never said we're going to be placing W1 stone at anything above 3. And the Corps took it, took this simple, this chart, to think that they were going to be, they used it as an excuse to disqualify it, and it shouldn't have been. Also, with regard to what the solicitation said for the equipment, the solicitation said list attachments, grapples, and other accessories currently mounted on the placing equipment, 15 of our original brief, currently mounted on the placing equipment. They didn't ask for every piece of equipment that you're going to use to be mentioned in your revised solicitation. All right, sir. I think we've given you enough time. Thank you, Your Honor. Thank you very much. Okay. The case is submitted. All rise.